**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**
**CIVIL ACTION NO. 4:19-CV-00128-HBB**

**NIKITA ROGERS**                                                                           **PLAINTIFF**

**VS.**

**ANDREW SAUL, COMMISSIONER**
**SOCIAL SECURITY ADMINISTRATION**                                    **DEFENDANT**

**MEMORANDUM OPINION**
**AND ORDER**

BACKGROUND

Before the Court is the complaint (DN 1) of Nikita Rogers ("Plaintiff") seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). Both the Plaintiff (DN 15) and Defendant (DN 21) have filed a Fact and Law Summary. For the reasons that follow, judgment is granted for the Commissioner.

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have consented to the undersigned United States Magistrate Judge conducting all further proceedings in this case, including issuance of a memorandum opinion and entry of judgment, with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed (DN 10). By Amended Order entered March 23, 2020 (DN 14), the parties were notified that oral arguments would not be held unless a written request therefor was filed and granted. No such request was filed.

FINDINGS OF FACT

Plaintiff, on behalf of her minor son ("Claimant"), filed an application for Supplemental Security Income on November 5, 2015 (Tr. 12, 173-79).   Plaintiff alleged that Claimant became disabled on March 3, 2013, as a result of seizures, speech impairment, and headaches (Tr. 12, 203). The claim was initially denied on March 10, 2016, and the denial of the claim was affirmed upon reconsideration on July 12, 2016 (Tr. 12).   Subsequently, Plaintiff requested a hearing on August 9, 2016 (Id.).   Administrative Law Judge Maribeth McMahon ("ALJ") conducted a hearing in Paducah, Kentucky on March 7, 2018 (Tr. 12, 37).[1]   Claimant appeared in person with his counsel, Jeff Smith (Tr. 37).   Plaintiff was also present as a witness (Id.).

In a decision dated October 15, 2018, the ALJ found that Claimant was a preschooler on November 5, 2015, the date the application was filed, and Claimant was a school-age child at the time of the hearing (Tr. 15).   The ALJ evaluated Claimant's disability claim pursuant to the three-step sequential child evaluation process (Tr. 15-29); *see also* 20 C.F.R. § 416.924.   At the first step, the ALJ found that the Claimant had not engaged in substantial gainful activity since November 5, 2015, the application date (Tr. 15).

Second, the ALJ determined that Claimant has the following severe impairments: speech impairment, epilepsy, attention deficit hyperactivity disorder, asthma, and headaches (Tr. 15-16). The ALJ opined that a "severe" impairment as defined for a child is more than a slight abnormality or combination of slight abnormalities that causes more than minimal functional limitations, and Claimant's impairments meet the specifications for "severe" impairments (Tr. 16).

---

1   The Court notes a conflict of information between the ALJ's report and the hearing transcript.   The discrepancies include how the hearing was conducted, who was present, and where the parties were located.   This appears to be a simple typographical error.   The Court relies on the hearing transcript to accurately confirm the information in the ALJ's report.   *Compare* Tr. 12 *with* Tr. 35-38.

At the third step, the ALJ concluded that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1 (Tr. 16-17).   The ALJ then detailed each consideration for each of the severe impairments (Id.).   First, for the Claimant's asthma, the ALJ considered Listing 103.03, which pertains to asthma, but the Listing requires a specified number of hospitalizations due to chronically inflamed airways, which each of the hospitalizations lasting at least forty-eight hours (Tr. 16).   As such, the ALJ found that the relevant evidence in the record did not demonstrate those specifications (Id.).   Second, for the Claimant's epilepsy, the ALJ considered Listing 111.02, which pertains to epilepsy, but the Listing required one of two types of seizures to occur on a routine basis: (A) generalized tonicclonic seizures occurring at least once a month for at least three consecutive months despite adherence to a prescribed treatment OR (B) dyscognitive seizures or absence seizures occurring at least once a week for at least three consecutive months despite adherence to a prescribed treatment (Id.).   But, the ALJ found that the relevant evidence in the record did not demonstrate those findings (Id.).   Third, for the Claimant's speech impairment, the ALJ considered Listing 111.09, which pertains to communication impairment, but that Listing required one of the following: (A) documented speech deficit that significantly affects the clarity and content of the speech, OR (B) documented comprehension deficit resulting in ineffective verbal communication for age, OR (C) impairment of hearing as described in Listings 102.10 or 102.11 (Id.).   Based on the relevant evidence in the record, the ALJ concluded that the requirements were not present (Id.).   Fourth, for the Claimant's ADHD, the ALJ considered Listing 112.11, which pertains to neurodevelopmental disorders for children ages three to eighteen (Id.).   The Listing requires a finding of both "A" and "B": (A) medical documentation of the requirements of paragraph 1, 2, or 3: (1) one or both of the following: (a) frequent distractibility,

3

difficulty sustaining attention, and difficulty organizing tasks; or (b) hyperactivity and impulsive behavior …, (2) significant difficulties learning and using academic skills; or (3) recurrent motor movement or vocalization; AND (B) extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; or (4) adapt or manage oneself (Id.). The ALJ found that these requirements were not demonstrated in the relevant evidence in the record (Id.). Finally, the ALJ referred to Appendix 1 when determining the applicable Listing for headaches (Tr. 17). The ALJ found that there were no specific Listings for headaches, but the ALJ considered the totality of Listing 111.00, which pertains to *Neurological – Children* (Id.). Ultimately, the ALJ concluded that no findings were demonstrated to meet any of the requirements under any Section under Listing 111.00 (Id.).

Subsequently, the ALJ found that the Claimant does not have an impairment or a combination of impairments that functionally equals the severity of the listings (Id.). In coming to this finding, the ALJ concluded that "claimant has less than marked limitation in acquiring and using information" (Tr. 23), "claimant has less than marked limitation in attending and completing tasks" (Tr. 24), "claimant has no limitation in interacting and relating with others" (Tr. 25), "claimant has no limitation in moving about and manipulating objects" (Tr. 26), "claimant has no limitation in the ability to care for himself" (Tr. 28), and "claimant has less than marked limitation in health and physical well-being" (Id.). The ALJ concluded that "the claimant does not have an impairment or combination of impairments that result in 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain functioning" (Tr. 29).

Thus, the ALJ determined that Claimant was not disabled since March 2, 2013 (Id.); 20 C.F.R. § 416.924. The Appeals Council denied Plaintiff's request for review (Tr. 1-4).

4

CONCLUSIONS OF LAW

Standard of Review

Review by the Court is limited to determining whether the findings set forth in the final decision of the Commissioner are supported by "substantial evidence," 42 U.S.C. § 405(g); Cotton v. Sullivan, 2 F.3d 692, 695 (6th Cir. 1993); Wyatt v. Sec'y of Health & Human Servs., 974 F.2d 680, 683 (6th Cir. 1992), and whether the correct legal standards were applied.   Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).   "Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way."   Cotton, 2 F.3d at 695 (quoting Casey v. Sec'y of Health & Human Servs., 987 F.2d 1230, 1233 (6th Cir. 1993)).   In reviewing a case for substantial evidence, the Court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."   Cohen v. Sec'y of Health & Human Servs., 964 F.2d 524, 528 (6th Cir. 1992) (quoting Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984)).

As previously mentioned, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-4).   At that point, the ALJ's decision became the final decision of the Commissioner.   20 C.F.R. §§ 404.955(b), 404.981, 422.210(a); see 42 U.S.C. § 405(h) (finality of the Commissioner's decision).   Thus, the Court will be reviewing the decision of the ALJ, not the Appeals Council, and the evidence that was in the administrative record when the ALJ rendered the decision.   42 U.S.C. § 405(g); 20 C.F.R. § 404.981; Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996); Cotton v. Sullivan, 2 F.3d 692, 695-696 (6th Cir. 1993).

5

### The Commissioner's Sequential Evaluation Process

The Social Security Act authorizes payment of Disability Insurance Benefits and Supplemental Security Income to persons with disabilities.   42 U.S.C. §§ 401 et seq. (Title II Disability Insurance Benefits), 1381 et seq. (Title XVI Supplemental Security Income).   The term "disability" is defined as an

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

42 U.S.C. §§ 423(d)(1)(A) (Title II), 1382c(a)(3)(A) (Title XVI); 20 C.F.R. §§ 404.1505(a), 416.905(a); Barnhart v. Walton, 535 U.S. 212, 214 (2002); Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990).

The Commissioner has promulgated regulations setting forth a three-step sequential evaluation process for evaluating a child's disability claim.   See "How we determine disability for children," 20 C.F.R. §§ 416.924, 416.924a, 416.924b, 416.926a.   In summary, the evaluation proceeds as follows:

1)   Is the claimant engaged in substantial gainful activity?

2)   Does the claimant have a medically determinable impairment or combination of impairments that causes more than minimal functional limitations?

3)   Does the claimant have an impairment that satisfies the duration requirement and meets, medically equals, or functionally equals the criteria of a listed impairment within Appendix 1?

20 C.F.R. § 416.924.   To meet a listing within Appendix 1, the child claimant must demonstrate both the diagnostic and the severity or "B" criteria are satisfied.   20 C.F.R. § 416.925(d).

6

To medically equal a listing, there must be medical findings supported by medically acceptable clinical and laboratory diagnostic techniques that demonstrate the impairment is at least equal in severity and duration to the listed finding.   20 C.F.R. § 416.926(a) and (b).   The Administrative Law Judge will consider the medical opinions of the State agency medical advisors in deciding medical equivalence.   20 C.F.R. § 416.926(c).

If the impairment does not meet or medically equal any listing in Appendix 1, the Administrative Law Judge will determine whether the impairment results in limitations severe enough to functionally equal the listings in Appendix 1.   20 C.F.R. § 416.926a(a).   In making this determination, the Administrative Law Judge will consider the degree of limitation caused by the impairment in six broad areas of functioning called domains.   20 C.F.R. § 416.926a(b)(1).   The six domains are (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and physical well-being.   20 C.F.R. §§ 416.926a(b)(1)(i)-(vi).   If an impairment results in "marked" limitations in two of the six domains or results in an "extreme" limitation in one of the six domains, then it is severe enough to functionally equal the listings.   20 C.F.R. § 416.926a(a).   A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities.   20 C.F.R. § 416.926a(e)(2)(i).   An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities.   20 C.F.R. § 416.926a(e)(3)(i).

Here, at the third step, the ALJ found Claimant was not disabled since November 5, 2015 (Tr. 29).

7

<u>Challenged Findings</u>

Plaintiff disagrees with the Findings in which the ALJ discusses the Claimant's diagnoses, with the Plaintiff asserting that the ALJ failed to address encopresis (DN 1).   In her initial complaint for judicial review, the fourth bullet on the list states: "The final decision of the Commissioner was erroneous, not supported by substantial evidence in the record, and/or contrary to the law" (DN 1, PageID 2).   However, the only two contentions the Plaintiff asserts is the alleged failed inclusion of encopresis and, based upon the medical records attached to Plaintiff's Fact and Law Summary (DN 15), the severity of the Claimant's epilepsy (<u>Id.</u>).

It is well-established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."   <u>United States v. Layne</u>, 192 F.3d 556, 566 (6th Cir. 1999) (quoting <u>McPherson v. Kelsey</u>, 125 F.3d 989, 995-96 (6th Cir. 1997)); *see also* <u>Brindley v. McCullen</u>, 61 F.3d 507, 509 (6th Cir. 1995) (observing that "[w]e consider issues not fully developed and argued to be waived."); <u>Rice v. Comm'r of Soc. Sec.</u>, 2006 WL 463859 at *2 (6th Cir. 2006) (unpublished opinion).

Here, it would be against sense for the Plaintiff to dispute the findings of the Claimant not having engaged in substantial gainful activity and that the Claimant does have an impairment, or combination of impairments, that causes more than minimal functional limitation.   However, the Plaintiff failed to assert any factual or legal basis to dispute the findings of the following impairments or their severity: speech impairment, ADHD, asthma, and headaches.

1.    The Parties' Arguments

Plaintiff, in her Fact and Law Summary (DN 15), does not explain which Findings are not supported by substantial evidence.   The Plaintiff asserts that the Claimant's encopresis was presented to the ALJ, but the Claimant's condition was not considered in the ultimate determination (DN 1-1, PageID 3).   Additionally, based on the Plaintiff's Fact and Law Summary, it would appear that the Plaintiff disputes the ALJ's finding about the severity of the Claimant's epilepsy (DN 15).

Defendant, in contrast, recounts the academic record of the Claimant, the ALJ's finding for the Claimant's attention deficit hyperactivity disorder (ADHD) and physical impairment, the timeline for the Claimant's therapy for his speech impairment, and the opinions of the medical consultants and the Claimant's kindergarten teacher (DN 21, PageID 756-60).   Defendant assets that "the ALJ reasonably concluded that [Claimant] was not disabled as of his application date" (Id. at PageID 754), and that the ALJ's conclusions were supported by sufficient evidence present in the record (Id. at PageID 766).

2.    Discussion

The Court appreciates the Plaintiff attempting to enlighten the Court by including the medical documentation to highlight the Claimant's condition, but as the Court noted in the "Standard of Review," the Court is bound to consider only the information that was in the administrative record (DN 9) at the time the ALJ rendered her decision and whether that decision was founded upon substantial evidence.   42 U.S.C. § 405(g); Smith v. Sec'y of Health and Human Servs., 893 F.2d 106, 108 (6th Cir. 1989) (citing Mullen v. Sec'y of Health & Human Servs. 800 F.2d 535 (6th Cir. 1986).   If the answer to the above question is "yes," then the Court may not even inquire whether the record could support a decision the other way.   Smith, 893 F.2d at 108

9

(citing Crisp v. Sec'y of Health & Human Servs., 790 F.2d 450, 453 n. 4 (6th Cir. 1986)); *see also* Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004) ("As long as substantial evidence supports the Commissioner's decision, we must defer to it, even if there is substantial evidence in the record that would have supported an opposite conclusion") (internal quotations omitted).

A.   Severity of Impairment(s) and Meeting
(or Medical Equivalent) Listed in Appendix 1

As recounted in the "Findings of Fact," the ALJ went through the Listings of Appendix 1 for asthma, epilepsy, communication impairments, neurodevelopmental disorders, and any Listing that could pertain to headaches (Tr. 16-17).

The Listing for asthma required three hospitalizations within a 12-month period since the onset date.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 103.03.  While the Plaintiff asserts that "[i]n [] one case [the Claimant] was rushed to the Emergency Room from school" (DN 1-1, PageID 3), one occasion of that event is not sufficient to meet the severity required for Appendix 1.  Even then, the Claimant's asthma had been described as mild, intermittent, and controlled (Tr. 19, 443, 481, 549, 551, 553, 556, 559, 612, 616, 618, 620).   The ALJ even went so far as to highlight that the incidents where the Claimant's asthma was exacerbated were typically during times of acute illness—but the Claimant's chest x-rays were normal (Tr. 19).  When reviewing the totality of the administrative record, the evidence present in the record shows the ALJ's determination was supported by substantial evidence, and this Court is bound to defer to the ALJ's determination.

For the Claimant's epilepsy, Appendix 1 specifies two distinct types of seizures, characterized as A or B.   20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 111.02.

10

"Generalized tonic-clonic seizures," which are described under type A, occur at least once a month for at least three consecutive months, despite adherence to a prescribed treatment plan (Id.). Conversely, B discusses "dyscognitive seizures," also known as "absence seizures," which occur at least once a week for at least three months, despite adherence to a prescribed treatment plan (Id.).   The Claimant was diagnosed with seizures, even though he exhibited a normal EEG during a sleep apnea examination (Tr. 20, 302, 335, 343).   The ALJ noted, from medical records, that the Claimant's seizures were under control in February 2018, and that the Claimant's neurologist noted no further seizure concerns since the last visit in June 2017 (Tr. 20, 639, 659).   In Plaintiff's Fact and Law Summary, Plaintiff has blocked off and underlined various medical records, supposedly to highlight the findings and potential abnormalities of the Claimant's EEG (DN 15). The record does indicate that the routine EEG that monitored the Claimant in June 2015 was read as abnormal with spike and polyspike wave discharges (Tr. 343, 625).   However, these discharges were why the Claimant was sent for a video EEG (Id.).   The medical documentation in the record specify, "Normal overnight video EEG in wakefulness, drowsiness and sleep. No lateralizing or epileptiform abnormalities were seen. None of the episodes of interest were recorded." (Tr. 321, 335, 579, 585, 599, 625).   The ALJ explained the evidence present in the record, including the Claimant's medication regimen, the evaluation results of the Claimant's purported seizures in the medical records, and Plaintiff's own testimony (Tr. 20).   Thus, the ALJ's determination was based upon substantial evidence, and this Court is bound to defer to the ALJ's determination.

As for headaches, the Claimant reported headaches prior to bed three to four nights a week (Tr. 20, 578-83).   As the ALJ noted, there was no listing in Appendix 1 for headaches (Tr. 17), but after review of the Listing 111.00 (*Neurological – Childhood*), there were no criteria for what could cause headaches to meet Appendix 1.   The Claimant was ultimately diagnosed with

11

common migraine without aura and was prescribed ibuprofen (Id.).   Claimant's medical records indicate that, following this diagnosis and prescription, the Claimant reported no recent headaches (Tr. 20, 658).   There is no recent evidence to dispute the ALJ's documentation of the headaches being under control.   As a result, the ALJ's determination was founded by substantial evidence, and this Court is bound to defer to the ALJ's determination.

Attention deficit hyperactivity disorder (ADHD) falls under Listing 112.11 of Appendix 1 (*Neurocognitive Disorders*).   42 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.11.   To reach the requirements set forth in Appendix 1, the Listing requires a finding of both "A" and "B": (A) medical documentation of the requirements of paragraph 1, 2, or 3: (1) one or both of the following: (a) frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or (b) hyperactivity and impulsive behavior …, (2) significant difficulties learning and using academic skills; or (3) recurrent motor movement or vocalization; AND (B) extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; or (4) adapt or manage oneself (Id.).   During the hearing, the ALJ noted "Interestingly, the claimant was appropriate during the hearing and answered questions posed to him in an intelligent, cooperative, and receptive manner." (Tr. 21).   The ALJ also noted that besides one school bus behavior offense and an undated "Weekly Behavior Chart," "the record is devoid of evidence supporting the claimant's mother's allegations of behavioral concerns that rise to the level of disability" (Id.).   Claimant's records show that his prescription for Adderall stabilize his condition, and that the Claimant's ADHD was well controlled with Adderall (Tr. 19, 549-51, 639). Additionally, the ALJ referred to the Claimant's Speech and Language Disability Evaluation to note that Emily Laird, CCC/SLP opined that the Claimant "entered [the] session without problems,

12

made good eye contact, interacted easily with [Ms. Laird], and demonstrated an age appropriate attention span" (Tr. 367). Therefore, the ALJ's determination was based upon substantial evidence, and this Court is bound to defer to the ALJ's determination.

Throughout the ALJ's record and determination, it was demonstrated that the Claimant's asthma, epilepsy, headaches, and ADHD were under control through prescribed medication (Tr. 19-20, 629, 639, 668-69).

Finally, Listing 111.09 addresses communication impairments. 42 C.F.R. Part 404, Subpart P, Appendix 1, Listing 111.09. To satisfy this Listing, one of the following is required: (A) documented speech deficit that significantly affects the clarity and content of the speech, OR (B) documented comprehension deficit resulting in ineffective verbal communication for age, OR (C) impairment of hearing as described in Listings 102.10 (*Hearing Loss Not Treated with Cochlear Implantation*) or 102.11 (*Hearing Loss Treated with Cochlear Implantation*) (Id.). In March 2016, Claimant was evaluated and demonstrated moderately impaired to average receptive language abilities; mildly impaired to average language abilities; and an articulation disorder placing him in the 20th percentile for sound production when compared to boys his same age (Tr. 19, 369-70). That being said, the examiner notated that the Claimant had no functional limitations with regard to the speech/language area at the time of communication (Tr. 370). Furthermore, Claimant's speech intelligibility was noted to be fair to good (Tr. 19, 397). Finally, the Claimant was noted to have mild receptive-expressive language impairment, moderate expressive language impairment, and moderate articulation impairment (Tr. 19, 396). Thus, the ALJ's determination was founded by substantial evidence, and this Court is bound to defer to the ALJ's determination.

B.    <u>Functional Equivalent of the Severity of the Listings in Appendix 1</u>

Following the ALJ's determination that the Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the Listings in Appendix 1, the ALJ then turned to a six-part analysis to discuss whether the purported limitations on the Claimant meet a functional equivalent, for children, of the severity of the Listings in Appendix 1 (Tr. 22-29); 20 C.F.R. § 416.926a.   This analysis utilizes six distinct domains to evaluate functional equivalence: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself [the child]; and (6) health and physical well-being.   (Tr. 22-29); 20 C.F.R. § 416.924a(b)(1)(i)-(vi).   Furthermore, additional relevant factors may be considered, such as (1) how well the child can initiate and sustain activities, how much extra help is needed, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of medication and other treatment (Tr. 22-29); 20 C.F.R. § 416.926a(a)(1)-(3).

i.    Six-Part Analysis

First, the determination of "acquiring and using information" is regarding how well a child is able to acquire or learn information, and how well the child can use the information they have learned.   20 C.F.R. § 416.924a(g).   For a preschool-aged child, they should "begin to learn and use the skills that will help [them] to read and write and do arithmetic when [they] are older."   20 C.F.R. § 416.926a(g)(2)(ii) (*Preschool Children (age 3 to attainment of age 6)*).   When a child grows to reach school-age, the child should "be able to learn to read, write, and do math, and discuss history and science. [They] will need to use these skills in academic situations to demonstrate what [they] have learned …"   20 C.F.R. § 416.926a(g)(2)(iv) (*School-Age Children (age 6 to attainment of age 12)*).   In coming to a decision, the ALJ discusses the Claimant's

Individual Education Program and his one-on-one assistance for reading, writing, and social skills (Tr. 23, 644-45).   These two points were issues with the Claimant's ability to acquire and use information, but the ALJ highlighted that "aside from that assistance, [the Claimant] was in general education classes for general core content" (Id.).   The ALJ discusses how the Claimant has not been forced to repeat any grades; the Claimant's academic performance level and his primary overall performance in reading standards, language standards, writing standards, math standards, science content, social studies content, social skills, and work habits were all on level (Tr. 23, 363, 365).   Furthermore, the ALJ drew upon the Claimant's performance in communication, academics, and general intelligence all being commensurate with his peers of a similar age (Tr. 23, 564, 641-42).   From all this information, and the information contained in the administrative record, the ALJ concluded that the Claimant has less than marked limitation in acquiring and using information (Tr. 23). This conclusion is supported by substantial evidence in the record.

Second, "attending and completing tasks" discusses how well a child is able to focus and maintain their attention; how well they begin, carry through, and finish their activities; and the pace at which they perform activities and the ease with which they change them. 20 C.F.R. § 416.926a(h).   The tasks are also to show the child's ability to avoid impulsive thinking and his ability to prioritize competing tasks and manage his time. (Id.); SSR 09-4p.   Like "acquiring and using information," the C.F.R. details separate age ranges and the situations in which a child without impairments should be able to focus their attention to complete. For example, a preschool-aged child without impairments should "be able to pay attention when … spoken to directly, sustain attention to [their] play and learning activities, and concentrate on activities like putting puzzles together or completing art projects."   20 C.F.R. § 416.926a(h)(2)(iii) (*Preschool*

15

*Children (age 3 to attainment of age 6)*).   As the child reaches school-age, they should "be able to focus [their] attention in a variety of situations in order to follow directions, remember and organize [their] school materials, and complete classroom and homework assignments."   20 C.F.R. § 416.926a(h)(2)(iv) (*School-Age Children (age 6 to attainment of age 12)*).   The ALJ highlights the Plaintiff's claims that the Claimant has significant problems with concentration and completing tasks, but the ALJ noted that the claimant had good eye contact with a medical provider, interacted easily with the provider, and demonstrated an age appropriate attention span (Tr. 24, 367).   The ALJ states, but without referencing specific transcript documentation, that the evidence present in the record does not indicate that the Claimant has required significant redirection during school (Tr. 24).   While the ALJ did not explicitly state this, the state agency reviewing medical consultants opined that the Claimant had less than marked limitation, and even one consultant stating that there was no limitation, in "attending and completing tasks," to which the ALJ gave significant weight to those opinions (Tr. 21, 80-88, 90-101); *see also infra* iii. Medical Opinion Evidence.   Based on all the information in the record, the ALJ concluded that the Claimant has less than marked limitation in attending and completing tasks (Tr. 24).   Even with the ALJ's lacking analysis of this section, specifically in correlating the C.F.R. to the present case, there is still substantial evidence in the record to support this finding.

Third, when "interacting and relating with others" is evaluated, it considers how well a child initiates and sustains emotional connections with others, how they develop and use the language of the community, their cooperation with others, how they comply with rules, respond to criticism, and how they respect and take care of the possessions of others.   20 C.F.R. § 416.926a(i).   The ALJ found that the Claimant has no limitation in interacting and relating with others (Tr. 25).   In the C.F.R., the rules specify that "preschool children" should be able to

socialize with children and adults, begin preferring playmates of their own age, and develop friendships with children their own age.   20 C.F.R. § 416.926a(i)(2)(iii) (*Preschool Children (age 3 to attainment of age 6)*).   As a child progresses into a "school-age child," they should be able to develop more lasting friendship with children who are their own age, understand how to work in groups, and have an increased ability to understand another person's point of view.   20 C.F.R. § 416.926a(i)(2)(iv) (*School-Age Children (age 6 to attainment of age 12)*).   The ALJ described and drew from these rules to make their determination.   The Claimant told the ALJ how he has several friends at school (Tr. 25, 48).   Several notes from the medical records describe the Claimant as pleasant, socially interactive, delightful, attentive, playful, and with a good sense of humor (Tr. 25, 388, 390, 548, 602).   The ALJ even noted that "claimant was appropriate during the hearing and answered questions posed to him in an intelligent, cooperative, and receptive manner." (Tr. 21).   As mentioned, the ALJ found that the Claimant has no limitation in interacting and relating with others (Tr. 25), and there is substantial evidence in the record to support this finding.

Fourth, when determining "moving about and manipulating objects," the ALJ observes and reviews how the child moves their body from one place to another, and how the child moves and manipulates objects.   20 C.F.R. § 416.926a(j).   This section describes that a preschool child should be able to walk and run with ease, use playground equipment with little supervision, play more independently, and should have more developed fine motor skills.   20 C.F.R. § 416.926a(j)(2)(iii) (*Preschool Children (age 3 to attainment of age 6)*).   As the child grows into a school-age child, they should be able to move around home, school, and their neighborhood at an efficient pace, increased strength and coordination for activities—such as running, jumping, throwing, kicking, catching and hitting balls—and fine motor skills should allow for the use of many kitchen and household tools independently.   20 C.F.R. § 416.926a(j)(2)(iv) (*School-Age*

17

*Children (age 6 to attainment of age 12)*).   Here, the ALJ plainly stated that the Claimant can throw, kick, dribble, and catch a ball, and the Claimant can walk and run without difficulty—all of which were directly drawn from the Claimant's medical records (Tr. 26, 388).   The Claimant told the ALJ that he plays basketball and video games, both of which highlight the use of strength, coordination, and fine motor skills (Id.).   A Developmental Medical Evaluation even described the Claimant as "quite a daredevil and likes to jump off furniture" (Tr. 388).   The same evaluation later conducted physical testing on the Claimant, who was able to "stand on one foot for five seconds, … toe and heel walk, … jump with two feet, and … hop on one foot." (Tr. 390).   The Claimant was also able to dress himself without help, count on his fingers, copy shapes, and recognized most letters (Tr. 26-27, 556).   Ultimately, the ALJ found that the Claimant has no limitation in moving about and manipulating objects (Tr. 26), and that finding is supported by substantial evidence in the record.

Fifth, "caring for yourself" requires an ALJ to consider how well the child can maintain a healthy emotional and physical state, including how well they get their physical and emotional wants and needs in appropriate ways; how the child copes with stress and changes in their environment; and whether the child can take care of their own health, possessions, and living area. 20 C.F.R. § 416.926a(k).   This section analyzes the child's ability to become "increasingly independent in making and following [their] own decisions," and the child's "basic understanding of [their] body, including its normal functioning, and of [their] physical and emotional needs."   20 C.F.R. § 416.926a(k)(1)(ii)-(iii).   Under this section, a preschooler without an impairment should "want to take care of many of [their] physical needs by [themselves] (e.g., putting on shoes, getting a snack), and also want to try doing some things that [they] cannot do fully (e.g., tying [their] shoes, climbing on a chair to reach something up high, taking a bath)."   20 C.F.R. §

416.926a(k)(2)(iii) (*Preschool Children (age 3 to attainment of age 6)*).   For a child that enters into the school-age range, the child "should be independent in most day-to-day activities (e.g., dressing [themselves], bathing [themselves]), although [they] may still need to be reminded sometimes to do these routinely. … [They] should begin to imitate more of the behavior of adults [they] know."   20 C.F.R. § 416.926a(k)(2)(iv) (*School-Age Children (age 6 to attainment of age 12)*).   As the ALJ noted, the Claimant is able to dress himself, bathe himself, and brush his teeth (Tr. 28, 388).   Furthermore, the ALJ noted that the Claimant was reported as having a warm and engaging personality, with a good sense of humor (Tr. 28, 388, 392).   While the ALJ notes the Claimant's preventative measures for accidents, as is discussed more in the section titled *Encopresis*, the ALJ describes that the Claimant is able to clean up after himself and perform his activities of daily living (Tr. 28).   Finally, the Claimant's kindergarten teacher, Ms. Short, stated that the Claimant had no problems in the domain of caring for himself (Tr. 28, 218).   Ultimately, the ALJ found that the Claimant has no limitation in his ability to care for himself (Tr. 28), and that finding is supported by substantial evidence in the record.

Sixth, "health and physical well-being" considers how the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the child's functioning that is not considered in the section regarding "moving about and manipulating objects."   20 C.F.R. § 416.926a(l).   The C.F.R. notes that when a claimant's physical or mental impairments, or a combination of physical or mental impairments has physical effects that cause "extreme" limitation in the claimant's functioning, then the claimant will generally have an impairment that "meets" or "medically equals" a listing. (Id.).   The ALJ described several examples of limited functioning in this domain that children of any age might have, as were set out in the C.F.R. (Tr. 28); *see also* 20 C.F.R. § 416.926a(l)-(4).   As has been mentioned previously,

the Claimant was diagnosed with asthma, epilepsy, ADHD, headaches, and a speech impairment. However, it was demonstrated that the Claimant's asthma, epilepsy, headaches, and ADHD were under control through prescribed medication (Tr. 19-20, 629, 639, 668-69).    Further, the Claimant, as of May 2016, has begun speech therapy for his impairment (Tr. 388, 391).    As such, the ALJ found that the Claimant has less than marked limitation in health and physical well-being (Tr. 28), and that finding is supported by substantial evidence in the record.

As a result of these sixth domains, the ALJ found that "the claimant does not have an impairment or combination of impairments that result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain of functioning (Tr. 29).

ii.    Relevant Factors

As previously mentioned, there are three factors that are primarily relevant in determining functional equivalence to the Listings in Appendix 1 (Tr. 22-29); 20 C.F.R. § 416.926a(a)(1)-(3).

First, the ALJ reviewed how well the Claimant could initiate and sustain activities (Tr. 17-21).    In addition to the Claimant's behavior and progress in school, which will be discussed more below, the ALJ noted that the Claimant was "able to name objects, able to repeat phrases, speak spontaneously, and had a normal vocabulary with an appropriate knowledge of current events and past history" (Tr. 18, 629, 662, 668).    Furthermore, during the hearing in front of the ALJ, the Claimant was cooperative, intelligent, and receptive in regard to the questions posed by the ALJ (Tr. 21).    The Claimant answered questions about his home life, such as siblings, his pet dog, and his pet dragon lizard; the Claimant was even able to discuss feeding the dragon lizard (Tr. 21, 46-48).    The Claimant also discussed his interests, like basketball, WWE, playing Nintendo, and playing on smartphones (Tr. 21, 49-50, 52).    Finally, the Claimant mentioned that he liked all of his teachers and was able to catch the school bus by himself (Tr. 52).    When describing the

20

extra help that may be necessary to assist the Claimant with an impairments, the Claimant does have an Individual Education Program with the Claimant spending approximately six hours per week on reading, writing, and social skills (Tr. 644-45).   However, notes from a physician's visit indicate that the Claimant's performance in school was good, despite his parents' concern about behavior and attention difficulties (Tr. 18, 581).

Second, as this Court mentioned above, the ALJ considered the Claimant's behavior at school (Tr. 21).   The ALJ opined:

> Aside from a single incident in February 2018, noted to be the first offense while riding the school bus in which the claimant did not stay in his assigned bus seat and in an undated "Weekly Behavior Chart" it was noted that on two out of five days, the claimant pushed in line, was not honest, and was very disrespectful when the teacher has turned her back, the claimant made inappropriate gestures, the record is devoid of evidence supporting the claimant's mother's allegations of behavioral concerns that rise to the level of disability.

(Tr. 21, 289, 295-96).   Furthermore, the Claimant told the ALJ that he liked school and had several friends there (Tr. 21, 390).   In kindergarten, the Claimant participated in regular education classes and was at level in reading standards, language standards, writing standards, math standards, science content, social studies content, social skill, and work habits (Tr. 18, 363-65). However, in January 2018, Claimant's second grade teacher, Sherri Riggs, had contacted Plaintiff about Claimant reading at 24 words per minute, but having a goal of 72 words per minute (Tr. 287).   Ms. Riggs warned that the Claimant was being pulled into a small-group intervention program, but Claimant was still not making adequate progress in his reading (Id.).   Following this letter was an "Intervention Progress Report" which detailed Ms. Riggs' review of Claimant's Reading, Math, and Written Expression Goals (Tr. 288).   In this report, Claimant was reported to

21

be "Not Meeting Goal" in all categories: Basic Reading (phonological awareness, phonics, sight words), Reading Fluency (words per minute, accuracy), Reading Comprehension (vocabulary, sentences, and/or progress), Computation (add, subtract, multiply, and/or divide), Math Reasoning (problem solving), Sentence Development, Writing Conventions, and Essay Development (Id.). Claimant also has an Individual Education Program and accommodations at school assist in those issues of concern (Tr. 641-52).

Third, this Court and the ALJ have thoroughly reviewed the Claimant's medical records, the tests and evaluations, the results, and the medical opinions.   In doing so, the ALJ found that, while the Plaintiff had initial problems with Adderall not helping the Claimant, a change in dosage managed to tame Claimant's ADHD (Tr. 19, 610, 639).   In fact, Claimant's ADHD was noted to be well-controlled with no concerns at school (Tr. 625), and the Plaintiff even reported that the Claimant was doing well on the dosage (Tr. 639).   As discussed previously, Claimant's seizures are under control as a result of medication, as well (Tr. 20, 578, 610, 629, 631, 639, 658, 663). The ALJ reviewed the reports regarding Claimant's seizures, noted the prescription of Depakote, described that "no further concerning events for seizures after the increase in valproate" (Tr. 20, 664), and that the Claimant's seizures were noted to be under control in February 2018 (Tr. 20, 639).   As for Claimant's headaches, the Claimant was diagnosed with common migraine without aura and was prescribed ibuprofen (Tr. 20, 578-83).   Since the diagnosis and prescription, Claimant "reported [no] headaches recently" (Tr. 20, 658-63).   This comports with what the ALJ found and was consistent throughout the medical records.   The Court has noted throughout this opinion that Claimant was diagnosed with asthma, but the record has noted that it to be mild, intermittent, and controlled, especially with the use of medication—Albuterol combined with a steroid in his inhaler (Tr. 19, 348, 367, 443, 481, 549, 551, 553, 556, 559, 612, 616, 618, 620).

22

Even during times where the Claimant's asthma was exacerbated, his chest x-rays were normal and only occurred during periods of illness (Tr. 19, 316, 318, 352-53, 553, 558-59, 615-16). Finally, the Claimant's speech impairment, while not being treated by medication, is still being addressed by the Plaintiff and the Claimant—as of May 2016, the Claimant began speech therapy in school (Tr. 19, 388, 391).   Prior to this therapy, the Claimant had never received any speech or language therapy in school (Tr. 19, 367, 607).   The records from the Claimant's therapy stated that the Claimant's speech was difficult to understand at times, he spoke in sentences, enjoyed talking, and his speech intelligibility was fair to good (Tr. 19, 388-90).

iii.     Medical Opinion Evidence

Furthermore, the ALJ detailed the medical opinions of Dr. William Underwood, Dr. Marina Yarbro, and Dr. Mary K. Thompson (Tr. 21, 80-88, 91-101).   Since the Plaintiff filed this claim before March 27, 2017, 20 C.F.R. § 416.927 applies to the ALJ's assignment of weight to the medical opinions in the record.   The process of assigning weight to medical opinions in the record begins with a determination whether to assign controlling weight to the medical opinion of a treating source.  20 C.F.R. §§ 404.1527(c); 416.927(c).   A treating-source opinion must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 376 (6th Cir. 2013).   If controlling weight is not assigned to the treating source's opinion, the Administrative Law Judge must consider the factors in paragraphs (c)(1)-(6) of the regulations in deciding how much weight to accord each medical opinion in the record, including the medical opinion from the treating source.   20 C.F.R. §§ 404.1527(c); 416.927(c); Gayheart, 710 F.3d at 376.

Physicians who had seen the Claimant, such as Drs. Karen Skjei, John Mori, and Rennan Quijano, did not testify at the hearing.   The ALJ stated that she gave "significant weight to the opinions" of Drs. Underwood, Yarbro, and Thompson (Tr. 21).   This was because "[t]heir opinions are generally consistent with the claimant's records as a whole …" with an exception to evidence placed into the administrative record at the hearing—evidence that the doctors would not have had the opportunity to review before making their determinations (Id.).   Dr. Underwood opined that the Claimant has less than marked limitation in acquiring and using information, no limitation in attending and completing tasks, less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, no limitation in caring for oneself, and less than marked limitation in health and physical well-being (Tr. 80-88).   Drs. Yarbro and Thompson also opined that the Claimant has less than marked limitation in acquiring and using information, less than marked limitation in attending and completing tasks, less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, less than marked limitation in caring for oneself, and less than marked limitation in health and physical well-being (Tr. 91-101).   The only distinction between all three opinions was that Dr. Underwood believed the Claimant had no limitation in attending and completing tasks, while Drs. Yarbro and Thompson's determinations were that the Claimant had a less than marked limitation (Tr. 80-88, 91-101).

Furthermore, the ALJ gave some weight to the opinion of Emily Laird, CCC/SLP, who was a speech and language consultant (Tr. 21-22).   Some weight was awarded to Ms. Laird's opinion because the ALJ concurred with Ms. Laird's examination, as the findings were supported by the record as a whole, but the ALJ disagreed with Ms. Laird's   total assessment that the Claimant's speech impairment resulted in no functional limitations whatsoever (Tr. 21-22, 367-70).

24

Ms. Laird explained that the Claimant's 504 plan did not include speech, and that the Claimant's inability to imitate the /r/ would not improve articulation over the next year without intervention (Id.).

Finally, while not truly medical opinion, the ALJ also awarded some weight to the opinions of Ms. Teresa Short—the Claimant's kindergarten teacher (Tr. 22).  Ms. Short completed a Teacher Questionnaire regarding the Claimant, with the Questionnaire following along the same six-factor analysis but also included other education-related questions (Tr. 22, 209-20).  Ms. Short opined that Claimant had problems in acquiring and using information and in attending and completing tasks but had no problems in interacting and relating with others, in moving about and manipulating objects, in caring for himself, and in health and physical well-being (Id.).  Ultimately, the ALJ gave some weight to Ms. Short because her opinions were consistent with, and were supported by the record, but Ms. Short only had interactions with the Claimant during the school year and only during kindergarten education level (Tr. 22).

Therefore, when reviewing the ALJ's description and analysis of the six domains for functional equivalence, the additional relevant factors, and the medical opinion testimony, the ALJ's determination was supported by substantial evidence, and this Court is bound to defer to the ALJ's determination.

### C.   Encopresis

As for the ALJ's alleged failure to discuss encopresis [2] during her analysis and determination, the ALJ explicitly noted "[w]hile [Claimant] does wear pull up protective garments

---

2   Encopresis is when a child repeatedly passes stool into their underwear, and the child usually is over the age of four—after the child has already been toilet trained.  Among other symptoms, encopresis is presented through leakage of stool (or liquid stool) into underwear and through problems with daytime wetting or bedwetting. *Encopresis*, STANFORD CHILDREN'S HEALTH, https://www.stanfordchildrens.org/en/topic/default?id=encopresis-90-P01992; *Encopresis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/encopresis/symptoms-causes/syc-20354494.

for accidents, he is able to clean up after himself, and perform his activities of daily living. Moreover, the claimant's teacher noted that the claimant has no problems in the domain of caring for himself" (Tr. 28, 209-20).   This comment was located under the determination that the Claimant has no limitation in the ability to care for himself.  *See above section discussing* "Functional Equivalent of the Severity of the Listings in Appendix 1".   While the ALJ does not explicitly name encopresis, instead referring to it as accidents (Tr. 28), the ALJ does still consider the diagnosis in her ultimate determination about the functional equivalent to the severity of Listings in Appendix 1.   Further, the Claimant's own medical records occasionally do not list encopresis, but instead list the Claimant's history of "accidents" (Tr. 352, 356-58, 555, 615, 619).

### 3.  Conclusion

As the Court noted previously, "[a]s long as substantial evidence supports the Commissioner's decision, we must defer to it, even if there is substantial evidence in the record that would have supported an opposite conclusion."   Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004).   Regardless of how this Court may view the evidence, it is not this Court's place to re-try or re-evaluate the findings of the ALJ.   42 U.S.C. § 405(g).   Rather, this Court is only to find if substantial evidence exists to support the ALJ's decision and if the ALJ followed the applicable law.   (Id.).   After reviewing the record, the Court concludes that the ALJ's determination is supported by substantial evidence in the record, the ALJ correctly followed the applicable law, and the ALJ does consider encopresis in her final determination.   Therefore, Plaintiff is not entitled to relief with regard to her challenge.

ORDER

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is **AFFIRMED**.

**IT IS FURTHER ORDERED** that judgment is **GRANTED** for the Commissioner.

September 18, 2020

**H. Brent Brennenstuhl**
**United States Magistrate Judge**

Copies:          Counsel of record
                 Plaintiff, *pro se*

27